Jones *v.* Schaefer et al., Appellants.

Argued October 2, 1947. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and JONES, JJ.

reargument refused November 24, 1947.

*Harbaugh Miller,* for appellants.

*Thomas F. Garrahan,* with him *Marcella R. Mc-Nanamy,* for appellee.

OPINION BY MR. CHIEF JUSTICE MAXEY, November 10, 1947:

In an action in equity instituted on April 2, 1946, by the plaintiff (who died March 14, 1947) to set aside a conveyance of real estate and the transfer of certain personal property made by him to his children, the defendants, the Chancellor made, inter alia, the following findings of fact: (1) "defendants were, at the time of said transfers and prior thereto, in a confidential relation to plaintiff, and this relationship existed during the time when such transfers were contemplated by defendants and carried out, and the said property was put in the names and in the possession of defendants without consideration, and purported to be a gift, and the burden is upon the defendants and each of them to prove affirmatively that the alleged gift was unaffected by any taint of undue influence, imposition or deception, and that it was the free and intelligent act of the plaintiff." (2) "Said defendants, and each of them, have not met the burden of proof resting upon them in this case." (3) "the conduct of defendants in the transactions between them and plaintiff had a tendency to mislead and deceive him, and did in fact mislead and deceive him, and the said deed and transfers were fraudulently procured from plaintiff by defendants."

The bill avers that William Jones, plaintiff, executed a deed on January 17, 1946, conveying without consideration therefor real estate situate partly in the Township of Mt. Lebanon and partly in the Twentieth Ward of the City of Pittsburgh, Allegheny Co., Pennsylvania. The grantees named therein were his children, Mazie B. Schaefer, Robert J. M. Jones and Walter D. Jones, appellants in the present case. The real property consisted of 50 unimproved lots valued at about $300 each and 2 improved lots upon which were erected a

duplex valued at approximately $9,000, with a monthly rental of $75, and a bungalow valued at approximately $7,000, with a monthly rental of $74.50. The bill further avers that "on or about the same date, to wit, January 17, 1946, the defendants procured the signature of the plaintiff to blank checks for his accounts at the Mellon National Bank, the West End Bank, the Allegheny National Bank and thereafter filled them in for the amounts of money on deposit in his name in each of the said banks, cashed each and every one of the checks and took possession of his pass books for the said accounts and retained possession of his money therefrom." The total of said deposits was $2065.39. The defendants on or about the same date procured plaintiff's signature on Traveler's Checks of the Mellon National Bank totaling approximately $150, cashed the checks and retained possession of the money therefrom and retained possession of all of his United States Savings Bonds amounting to $1200. At the time of this conveyance and these transfers, plaintiff was 82 years, 5 months and 2 days old and was in a "much improved" condition and seemingly in possession of "his full faculties" after a serious illness hereinafter referred to.

On December 24, 1945, plaintiff, who had been residing for a number of years with his son Robert, arose early, dressed and left in zero weather for an undisclosed destination. At that time he was afflicted with a heavy chest cold and was admonished by his son and daughter-in-law against leaving the house. That night plaintiff failed to return home and nothing was known of his whereabouts until December 26th when his son Robert, through a Christmas card addressed to plaintiff, was able to locate him in the room of a friend, Mrs. Mary Scaris, with whom he had been staying since December 24th. Mrs. Scaris was a roomer in the home of Mr. and Mrs. Joseph Chubarov at 1300 Hartwell St., Westwood, Pittsburgh, and was very friendly with plaintiff. On December 27th, plaintiff's daughter Mazie Schaefer

and his son Robert called for him in a car and returned him to his residence. Plaintiff, whose cold had become more serious while he was with Mrs. Scaris, was placed under the care of a physician and confined to his bed.

Dr. O'Neill visited plaintiff on December 28th and diagnosed his condition as "a heavy chest cold." Subsequent professional visits were made by him on December 31st, 1945, January 3rd, 5th, 9th, 12th and 19th, 1946. Dr. O'Neill testified that on December 31st plaintiff's condition was "considerably worse" and "he had symptoms of bronchial pneumonia" and he "wasn't totally rational". "He wouldn't follow instructions. He wouldn't stay in bed and he talked in a manner that wasn't wholly sensible." Plaintiff also had an auricular fibrillation (irregular heart beat). On January 3rd and 5th, plaintiff was still irrational and the condition of his bronchial pneumonia and heart remained the same. His answers to the doctor "weren't sensible answers" and he was also somewhat "hard of hearing". As to the patient's impaired hearing, Dr. O'Neill testified: "I had to speak louder than a normal tone of voice". Dr. O'Neill, when cross-examined as to his January 9th visit, stated that plaintiff "was improving at that time"; he was "not totally rational, but he showed definite improvement". He said that on January 12th the patient's condition was much improved. The doctor testified: "I was real surprised how much better he was". "He understood what I told him regarding medical matters". The physician then was asked if his patient "had his full faculties at that time". He answered: "He seemed to have." "That time" was January 12, 1946, five days before Jones executed the challenged deed and checks. He did not see Jones again until after the 19th. He described his condition then as being "about average for his age". Jones had no trained nurse in attendance but his son and daughter-in-law took care of him.

As to the circumstances attending the various transfers, Mazie B. Shaefer testified on direct examination that "on the 15th [of January] . . . I went to see him [plaintiff]. So, he asked me to get things straightened up, that he wanted to pay his taxes again, and he wanted to turn the deed over to us to have the deed written up for the three of us and he told me to get his check book, his bank books, out of the drawer and for the West End Bank he signed a check for $130 made out to my brother and I, and he signed the tax check and he signed the traveler's checks and he signed the check for the $130 made out to my brother and I, and he signed the tax check and he signed the traveler's checks and he signed the check for the First National Bank on the North Side." She was asked: "At the time he signed them what conversation did you have?" She replied: "he said . . . he was getting too old to take care of them [the properties] and he wanted us children to have them." "Q. Was there anything said as to the amounts of his money or accounts? A. Yes. He seemed to know how much he had . . ." The witness said that on the 16th of January plaintiff gave her signed checks drawing out money from his accounts and transferring the account from the First National Bank of Pittsburgh, Federal Street Branch, to an account in the joint names of Robert and herself. The witness further stated that a new deed was made in accordance with her father's instructions by defense counsel, Mr. Pratt, that "I ['witness] took it up and showed it to my father and . . . he looked at it and he read it and I asked him then if it would be all right to get a Notary. That was in the early evening [January 17th]. And he said yes, it would be all right to get a Notary to go ahead with it . . . my brother Robert brought the Notary and we went upstairs after that . . . and he [the father] said that was O. K., and it was signed."

Albert J. Sauter, who witnessed the execution of the deed, testified: ". . . Mr. Robert Jones called me

up and asked me if I would come down and witness his signature. I told him, 'Why certainly.' So, I went down to Robert Jones's house. I didn't know what it was all about. So, he was telling me the story of what it was about. Of course, his dad had been sick. He was still upstairs but he had been feeling much better then and Bob says . . . but Bob showed me a Will that Mr. William H. Jones had made out. He told me he desired that the children should have everything and in case anything should happen to them he would like to have everything split up as close as they could. . . . So, we went upstairs and Mr. William H. Jones was sitting up there and the Notary read the deed off to him and he wanted him to sign it and he says yes, he would. He says, 'Well, do you know what you are signing?' He says yes, he knows he is signing a deed; that he didn't want to be bothered any more; that it was too much work for him; that he couldn't take care of it, and of course, he signed his name. He wasn't going to sign it the way the notary wanted him to. He wanted to abbreviate the 'William' and the notary insisted that he write 'William' out in full. He says, 'No, I always did sign my name "Wm" ', but in this case the Notary told him it would have to be 'William H.' So, he wrote it out that way and, of course, I witnessed the signature and the rest of them went downstairs." The will referred to in the witness' testimony was one executed by plaintiff on January 12, 1931, in California. By the terms of the will, all plaintiff's real and personal property, with the exception of $1.00 which was bequeathed to his wife who predeceased him, was devised and bequeathed to defendants in equal shares.[1]

C. E. Schwartz, Notary Public, testified that "He [Robert] called me at my home about evening meal time [January 17th] and asked me if I would be free to have

---

[1] This witness also testified that Robert Jones (the son) explained to him that the deed was being made out to save inheritance taxes.

a deed acknowledged and I said that I would be, so he volunteered to come over and he picked me up and I went over to his house." The deed was given to plaintiff by Robert Jones. "He [plaintiff] was partly lying down, propped up a little more, and he affixed his signature to the deed and I had him acknowledge that he had signed his name to the deed and I signed my name thereafter and affixed my seal." "Q. Did he know what he was doing? A. He did, yes, sir. I had him acknowledge the deed and he said he did—to be his act and deed and desired same to be recorded as such, and he said he did."

Robert Jones testified that on January 13th his father told Mazie that he wanted the City and School Taxes for 1946 paid, that "he was getting too old to take care of the properties and he would deed them over to the three of us providing he got the rents . . . He told Mazie to get his old deed out of his box, which was in the cupboard . . ." On January 15th, plaintiff, according to Robert's testimony, "said that he wanted the deed properly fixed out and the deed was laying on top of his chest of drawers which I [witness] picked up, because after he mentioned he wanted the deed made we picked it up, in other words, in accordance with his wishes." The witness said that he and his sister Mazie called upon their attorney, Mr. Pratt, and told him "That we wanted a deed made out for the three of our names, to my sister and brother, that it was. Father's wish . . ." He continued: "on the 17th I received the deed from you [Mr. Pratt] in your office. I arrived at home in the evening. I got my sister before I went home and took her with me. In the meantime she went down and went up to see Father, took the deed and read it to him."

Plaintiff alleges that in February 1946 he discovered that his papers, which were kept in his room, were missing, and he inquired of defendants, concerning them but was unable to get any information. In February he con-

sulted his attorney and the latter examined the records in the Recorder of Deeds Office of Allegheny County, and ascertained that the deed now challenged was recorded. Plaintiff testified that he demanded the return to him of his moneys and other personal property and that this demand was refused. On April 2, 1946 he filed a bill in equity. When questioned about his signature on the various checks and on the deed, he repeated "I must have signed it when I was out of my mind." On February 21, 1947, plaintiff entered into an Agreement of Trust with the Peoples First National Bank and Trust Company of Pittsburgh, substituted plaintiff, conveying his right, title and interest in his real and personal property to the latter. On March 14, 1947, plaintiff died and his trustee was therefore substituted as plaintiff in this action. The court decreed on April 2, 1947, that the deed in question was null and void and should be set aside and the transfer from plaintiff to defendants of the sum of $2065.39 (not $2740.70, the amount incorrectly set forth in plaintiff's bill) was obtained by fraud, undue influence, etc., and was null and void and defendants should be required to return to the substituted plaintiff all and every part of said money.

The defendants deny that they exerted any undue influence over the plaintiff and they assert that the personal and real property conveyed to them were the free and voluntary acts of plaintiff and were not procured by any fraudulent misrepresentations or undue influence, that the plaintiff made a gift inter vivos to them out of natural love and affection and that the real estate was conveyed in order that the plaintiff may be relieved of the burden of managing his estate. They said they agreed to collect the rents and turn them over to the plaintiff, although no reservation to that effect was incorporated in the deed, and in fact they did collect the rents and turn them over to their father. The plaintiff voluntarily and of his own request signed checks transferring his savings accounts to defendants. Defendants

deny that by reason of their father's illness and age he was in a weakened condition in mind and body and was unable to understand and comprehend the nature of the instruments signed by him. With respect to the United States Savings Bonds, plaintiff admitted that he had entrusted them to his daughter Mazie for safe-keeping in her safe deposit box; that an equal share was made out in the joint names of plaintiff and each of the defendants. The defendants, at the time of the trial, surrendered custody of the bonds and relinquished them to the plaintiff. Throughout the trial defendants freely acknowledged their participation in the preparation of the instruments in question, admitting all facts with regard thereto, and disclosed that the moneys transferred were, during the pendency of the action, still on deposit in their account. There was no attempt at concealment by them and the record is barren of any evidence of coercion, deception, or any imposition in any form practiced by these defendants upon their father. The defendants, particularly Walter D. Jones and Robert J. M. Jones, made improvements and repairs to plaintiff's property and had provided homes for the plaintiff and taken care of him since their mother died on July 25, 1925.

In reading this record, we reach the conclusion that the act of William H. Jones, now deceased, in turning over the property in question to his children was a voluntary one and that at the time he was "rational" (as his physician described him) and that just as he "understood what" the doctor "told him regarding medical matters", he likewise understood the business matters he then transacted. Since, as his physician testified, he "seemed to have his full faculties" on January 12, 1946 and he was then so "much better" that the doctor told him that he "didn't think he needed to come back for another week" and since on the 19th the doctor found him "still more improved than on the previous visits" we find in this record no support for the basic findings

of the court below, to wit, (1) Defendants procured (on January 17, 1946) the transfers of the real and personal property of plaintiff to themselves by undue influence; (2) That at the time, plaintiff was "completely subject to the directions, order and influence of those about him". (3) Plaintiff was "unable to understand and comprehend the nature, consequences and effects of the deed, papers and documents by which the transfer was made of plaintiff's real and personal property to the said defendants" and (4) "said deed and transfers were fraudulently procured from plaintiff by defendants."

This Court will not lay down a rule that because an individual is between 82 and 83 years of age and is recovering from a physical illness, any act of his at that time in executing a legal document disposing of his property will be treated as a nullity. Other than the fact of William H. Jones' age and the fact that he was suffering from a "kidney disturbance" and from an "enlargement of one of the glands of his body" and from "generalized arteriosclerosis", he was in a legal sense, as capable of transacting business at the time he executed the documents in question as any other man would have been. The facts cited did not so reduce his mental capacity to transact business as to justify a court's deciding that his acts at the time can be given no legal effect. This court has frequently in its decisions manifested its respect for the integrity of written instruments, and such instruments are not to be set aside except upon convincing testimony that their execution was tainted with fraud, either actual or constructive, or that the person so executing them did not have what the law considers sufficient mental capacity to do so.

It is clear that some time after Mr. Jones executed the papers in question, he regretted his act and tried to induce the court to undo what he had done, by claiming that when he executed the papers he "must have been out of his mind". Many persons who regret acts of theirs say: "When I did that act I must have been out

of my mind", but their regret thus expressed cannot undo what is done. What the "moving finger writes" cannot be blotted out for "light and transient" reasons.

We agree with the court below that a confidential relation did exist between this plaintiff father and his defendant children and that the burden was upon these children as the donees of a gift to prove affirmatively that the gift was the free and intelligent act of the donor and was free of fraud and undue influence.[2] However, in this case we cannot agree with the court below that the defendants failed to meet this burden. From the testimony in this record we are convinced that, in the language of this court in *Thorndell v. Munn*, 298 Pa. 1, 147 A. 848, the act of William H. Jones in transferring his property to these defendants, his children, was "the free and intelligent act of the donor, fully explained to him, and done with a knowledge of its consequences."

Under the facts of this case, it is appropriate that these defendants who acquire this property should pay the costs.[3] The decree is reversed; appellants will pay the costs.

---

[2] See: *Lochinger v. Hanlon*, 348 Pa. 29, 33 A. 2d 1; *Union Tr. Co. of Pbgh. v. Schreck*, 335 Pa. 190, 6 A. 2d 428; *McCown v. Fraser*, 327 Pa. 561, 192 A. 674; *Weber v. Kline*, 293 Pa. 85, 141 A. 721.

[3] Under the will of January 12, 1931, William H. Jones made equal division of his property among the defendants but as the court below pointed out in its opinion: "there was also testimony by the plaintiff and others of another will—a typewritten will executed subsequent to January 12, 1931. There was some confusion in the testimony with respect to these two wills . . . this record . . . does not show which of these two wills was accepted for probate." It is *possible* that under a will subsequent to the will of January 12, 1931, if such a will is produced and is valid, the testator may have made a disposition of his property different from that made in the will of January 12, 1931. Under our decision, the question of wills becomes of no importance to the parties involved in this litigation.