Fuller, Appellant, *v.* Fuller.

Argued November 11, 1952.   Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY and MUSMANNO, JJ.

*George W. McKeag,* with him *R. J. Cleary* and *Philips, Farran & McKeag,* for appellant.

*Frank O. Schilpp,* with him *Rambo & Mair,* for appellee.

OPINION BY MR. JUSTICE CHIDSEY, January 5, 1953:

Minnie J. Fuller died on July 1, 1948 at the age of 92 years, intestate, leaving as her only heirs her two sons, Walter J. Fuller and Lawrence J. Fuller, to both of whom letters of administration on her estate were duly granted. Walter J. Fuller filed a bill in equity as one of the administrators of the decedent's estate praying that the defendant Lawrence J. Fuller be ordered to pay to the administrators of the estate a balance of $9,018.85 remaining at the time of the decedent's death in an account at the Girard Trust Company of Philadelphia and similar balances of $1,-753.46 and $175.82 respectively in two accounts at the Sewickley Branch of the Peoples-Pittsburgh Trust Company (now Peoples First National Bank and Trust Company) ; and that the defendant also be ordered to account for all sums drawn upon the Girard Trust Company account during the lifetime of the decedent, and to pay to her estate all withdrawals which were not used solely for the decedent's benefit. All of the accounts mentioned were held in the joint names of the decedent and Lawrence J. Fuller, with right of survivorship. They were initially created by transfers from individual bank accounts of the decedent. No monies then or thereafter were contributed to the accounts by the defendant. The account in the Girard Trust Company was created on February 24, 1945 when an agreement supplied by the bank was signed by the

decedent and defendant which provided that the sums held in the joint account should belong to them as joint tenants and not as tenants in common, checks for orders against which might be drawn by each of them. It also contained the following language: "In case of the death of any of the undersigned, the balance in the joint account shall belong to the survivors or survivor, and Girard Trust Company may deal with the survivors or survivor as sole and absolute owners or owner thereof". The transfers at the Pittsburgh bank were made after cards furnished by the bank were signed by Mrs. Fuller and the defendant on September 14, 1946, which provided: "It is agreed and understood that any and all sums that may from time to time stand on this account to the credit of the undersigned depositors, shall be taken and deemed to belong to them as joint tenants and not as tenants in common; while both joint tenants are living, either may draw and in case of the death of either, this Bank is hereby authorized and directed to deal with the survivor as sole and absolute owner thereof.".

Plaintiff alleged in his bill that defendant caused the decedent to make the transfers into the joint accounts by coercion, intimidation and undue influence and by the making of fraudulent and false representations at a time when the decedent was 88 years of age and in a state of mental confusion and disturbed condition; also that a confidential relationship existed between defendant and his mother. Defendant filed a responsive answer denying all of the material allegations in plaintiff's bill. After hearing on the merits, the chancellor entered a decree *nisi* in favor of the defendant. After the overruling of exceptions by the court *en banc,* a final decree was entered on March 5, 1952 affirming the chancellor and dismissing the bill. Plaintiff appeals therefrom.

The decedent, Mrs. Fuller, who had lived in or near Pittsburgh, went to Atlantic City for her health in 1941. She stayed at the Hotel Dennis until 1942 when that hotel was taken over by the United States government. She then moved to a nursing home in Atlantic City where she remained until her death. She was the widow of an army officer who died in 1902 and from the testimony, unquestionably was an educated, well traveled and intelligent woman who displayed an active interest in social affairs, politics and current events. She was very much attached to the defendant, who lived in or near Philadelphia, and to his two daughters. The defendant frequently visited his mother at Atlantic City and he and his wife helped the decedent in making out checks and in other business matters of a minor nature, and, as well in some personal matters. It appears, however, that decedent transacted her own important business affairs until the time of her death, including the negotiation for and consummation of the sale of her former residence at Edgeworth, Allegheny County, Pennsylvania, in September of 1946. The other son, Walter J. Fuller, the plaintiff, who was childless, resided in Pittsburgh and only visited his mother five or six times during the last five or six years of her life. The defendant was apparently very considerate and helpful to his mother while she was in Atlantic City and it was not unnatural that she should have extended her bounty to him, especially because of her manifested deep interest in his two children.

Decedent left a gross estate of something over $13,-000, exclusive of the three joint bank accounts. During her lifetime she received income from a trust fund, the principal of which amounted to $34,000 in an account stated as of March 6, 1951, and from a smaller trust or agency account of about $6,000, in both of

which each of the two sons shared the principal equally upon her death. She also received a pension from the government amounting to about $60 per month.

The appellant attacks the validity of an *inter vivos* gift. He alleges undue influence. In order to establish his claim, the burden was upon him to prove the existence of undue influence unless he showed a confidential relationship between appellee and the decedent. If he successfully established such confidential relationship, then the burden of showing the nonexistence of undue influence was upon the donee-appellee.

We have carefully reviewed the entire record in this case and adopt the language of the chancellor in his discussion of the testimony, and, as well, the findings and conclusion contained in the following portion of his adjudication: "Plaintiff relied chiefly upon the testimony of defendant who was called as on cross-examination. His testimony was very lengthy but nowhere in its entirety can there be perceived any basis for a finding of coercion, intimidation and undue influence. To the contrary, the definite impression is gleaned that decedent declined to rely upon defendant in making her decisions on the rare occasions when her business interests were involved, namely, the two transfers of the bank accounts, and the sale of her former home. As to the bank accounts, she herself signed the request to the Girard Trust Company to arrange the transfer, in the form of a typewritten letter. She also signed the request for the Sewickley transfers. True, the letter was handwritten by defendant's wife, but there was no testimony offered which cast any suspicion upon this incident. Plaintiff alleged that defendant obtained and gave to his mother the cards for the transfer of the Girard account, but an official of the bank, called by defendant, produced office records

showing that on two occasions after receipt of decedent's request for the transfer, the bank had sent the cards to her. The registered nurse, at whose nursing home in Atlantic City decedent spent the last six years of her life, testified that decedent was a very strong-willed person, very marked in her likes and dislikes, enjoying good eyesight, possessing a wonderful memory, and clear-minded and cheerful to the end of her life. A physician who treated her for a diabetic condition between January, 1939 and March, 1945 (which included the date of the transfer of the Girard account), stated that decedent was perfectly sane and normal, very fixed in her ideas about things, and capable of transacting her business affairs; that she knew what she was doing and what she wanted to do, having a very strong will. Attesting and subscribing witnesses to documents involved in the questioned transactions included the nurse on the signature cards for the transfer of the bank accounts, a notary public on the agreement for the sale of decedent's property in western Pennsylvania, and another notary public on the deed conveying this property. From none of them was elicited a word of testimony to taint the good faith and validity of the respective transactions. They described decedent as pleasant, aware and intelligent in each instance. We are compelled, therefore, to hold that plaintiff has failed to establish his charges of coercion, intimidation, undue influence, and false and fraudulent statements by defendant, which resulted in decedent's executing the transfers of the bank accounts. On the contrary, we find that decedent was aware of the nature and character of the acts she was performing and intended to confer the benefits thereby accruing to defendant. She was clearly able, physically and mentally, to transact her business affairs, and did not rely upon defendant and his wife in that regard.".

Plaintiff points to the fact that decedent was advanced in years, to the fact that defendant and his wife assisted his mother in making out checks and making entries in her check book, and to assistance rendered by them in the mechanics of consummating the bank transactions complained of. It clearly appears from the evidence that with respect to these transactions, the decedent's action was voluntary and undertaken with complete understanding of their nature, terms and consequences. According to the defendant, the transfer of the accounts was not prompted by him or his wife but was his mother's idea, and she initiated the conversations with regard thereto. After reading all of defendant's testimony, we are impressed, as was evidently the court below, with his frankness and credibility. In *Gerner et al. v. Kespelher et al.,* 351 Pa. 649, 41 A. 2d 860, we said, "The mere fact that the decedent was old was not sufficient to show that she was incapable of understanding the nature of her acts or that she was subject to the influence of her son. Nor are these results proved by evidence that he assisted her in some business transactions. . . .".

We are in accord with the finding of the chancellor that no confidential relationship existed between the defendant and the decedent. As between parent and child, the existence of a confidential relation is a question of fact to be determined from the evidence: *Gerner et al. v. Kespelher et al.,* supra; *Null's Estate,* 302 Pa. 64, 153 A. 137. The burden of proving a confidential relationship was upon the plaintiff, (*Kees, Executor, v. Green,* 365 Pa. 368, 75 A. 2d 602), and the plaintiff failed to establish such relationship. In *Null's Estate,* supra, where this Court refused to set aside a gift by a decedent 87 years of age to a son, we held that the evidence necessary to show a confidential relationship between parent and child must be certain and that

". . . care must be used not to confound acts springing from natural love and affection with confidential relations, . . .". The evidence in the present case did not support a finding of confidential relationship and the burden, therefore, remained upon plaintiff to prove that decedent's creation of the joint accounts was the result of undue influence, intimidation or fraud. This he failed to do.

Appellant contends that even if the bank accounts in question were validly created, nevertheless the decedent did not intend to give defendant any present interest therein, notwithstanding the agreements signed. Appellant points to excerpts from the testimony of the defendant where he stated that he did not have the right to make withdrawals. However, the defendant explained such testimony on his part by stating that he felt he did not have a moral right to draw on the accounts because his mother had contributed all of the money in them. He was cross-examined by plaintiff's counsel at some length with respect to a check of $500 which was signed by the decedent and used by him for investment in a business concern in which he was interested. Later during his testimony he was asked by his own attorney: "Q. Why didn't you draw on that account yourself for the $500?" and he answered, "Well I had a perfect legal right to draw on it for $500, and that was what the account was, a joint account that either could draw, but I felt the money was originally my mother's and I—it was the courtesy thing to do on my part, if I wanted to use this $500, was to ask her and have her give it to me as a gift rather than draw it myself from the joint account.". Appellant also points to a statement by the defendant in his testimony that ". . . it was sort of an understanding between my mother and myself that the joint account was primarily for her use until her death, and then when she died it

248

would be mine.". On his examination by his own attorney with respect to this understanding with his mother, the testimony is as follows: "Q. You also said on cross-examination by Mr. McKeag something about an understanding with your mother. Do you mean to tell the Court that you discussed whether or not you could draw on this account, or did you say you could not draw on this account without your mother's consent? Did you talk that over with her? A. No. I mean that I felt it was a moral obligation on my part not to make large withdrawals from this joint account, because the money was originally hers. Q. Did your mother ever request you not to draw on this account without her express permission? A. No, she never made any stipulation whatsoever of that kind. Q. Did you make any promise to her, or statement to her, that you wouldn't draw on this account without her express permission? A. No, I never did.". No checks were drawn by either decedent or the defendant on the joint accounts in the Pittsburgh bank. Twenty checks were signed by and drawn on the Girard Trust Company account by the defendant. The proceeds of many of these checks were applied to the needs of the decedent but the proceeds of a number of them were applied by the defendant to his own use. A fair conclusion to be drawn from all of the defendant's testimony is that he considered himself as having the right to draw on the accounts but was hesitant to do so because the accounts represented entirely the contributions of his mother and he felt despite his legal right to make withdrawals, morally reluctant to make any major withdrawals during her lifetime. The intent of the decedent as clearly expressed in the written agreements with the banks was to make a present gift of a one-half interest in the respective bank accounts with the right of the survivor to take whatever remained in the account upon the

death of either. Since this intent was clearly expressed, it would require much stronger evidence than the testimony relied upon by plaintiff—which at best was equivocal—to prove a contrary agreement.

Appellant has cited a number of cases (including *Edwin Gaw Flanagan, Administrator of Bridget Gallagher, deceased v. James Nash*, 185 Pa. 41, 39 A. 818, and *Zellner's Estate*, 316 Pa. 202, 172 A. 715) where it was held that joint ownership in joint accounts was not intended or created. But in these cases there was no joint ownership of the fund created by agreement in writing as here, but only a right to withdraw by either party. In the present case it was expressly agreed that the money deposited and held in the joint account should belong to the decedent and the defendant as joint tenants and not as tenants in common, with right of survivorship.

In *Mader et al. v. Stemler et al.*, 319 Pa. 374, 179 A. 719, monies wholly belonging to a decedent were deposited during his lifetime in a joint account under an agreement prepared by the bank and signed by the decedent and his daughter. The agreement provided: " 'The sums deposited in this account belong to Frank Stemler and Jean Stemler jointly, it being understood each may withdraw upon his or her or their individual order during joint lives, and we hereby direct and authorize the Camp Curtin Trust Company, Harrisburg, Pa., to pay any balance remaining upon the death of either of us, to the survivor.' ". In holding that the daughter received upon the execution of the agreement an interest as joint owner, Mr. Justice LINN, after quoting the agreement, said at p. 378: ". . . Certain results were undoubted. The bank agreed to repay the deposit to either on demand. Its obligation was a chose in action. As between him and his daughter, Stemler transferred to her an interest in the chose—an interest

in the right to receive payment from the bank; he expressed his donative purpose; as part of the evidence of intention, he executed and delivered the agreement creating a joint interest with the right of survivorship. They agreed that 'the sums deposited . . . belong to . . . [them] . . . jointly'; they provided that either might withdraw the money during their joint lives, and the survivor, on the death of either. An interest as joint owner was transferred, as appears from the statement that 'the sums . . . belong to . . . [them] . . . jointly'; it was not merely a power to collect (as to which, see Flanagan v. Nash, supra; Zellner's Est., supra). . . .".

In *Cochrane's Estate*, 342 Pa. 108, 20 A. 2d 305, in referring to agreements creating joint accounts with provisions identical with those involved here, we said: " '. . . They [the agreements] created the relationship of joint tenants between the parties which, of itself, gave each an equal interest in the fund.' . . . Even where one contributes the entire sum to a joint bank account, the rights of each of the tenants to the joint fund are the same, the one who made the contribution has by that act made an immediate gift to the other: Mader v. Stemler, 319 Pa. 374, 179 A. 719; Culhane's Est., 133 Pa. Superior Ct. 339, 2 A. 2d 567, affirmed by us, 334 Pa. 124, 5 A. 2d 377. . . .".

The decree of the court below is affirmed at the cost of appellant.