## Wann Estate.

Argued September 29, 1954. Before RHODES, P. J., HIRT, GUNTHER, WRIGHT, WOODSIDE and ERVIN, JJ. (ROSS, J., absent).

*Joseph E. DeSantis*, with him *Clarence C. Mendelsohn*, for appellant.

*Aaron A. Brumbach*, with him *George B. Balmer* and *Snyder, Balmer & Kershner*, for appellee.

OPINION BY ERVIN, J., November 9, 1954:

In January of 1948 Peter H. Wann and Ella May Wann, his wife, left their residence in East Cocalico Township, Lancaster County, and moved into the home of their daughter, Florence K. Boyer, who lived in Reading, Pennsylvania. In July of 1948 they sold their residence and personal effects at a public sale. Peter H. Wann died on November 5, 1948 at the age of 74 years. He left no estate but there remained a joint bank account in the names of his wife and himself as tenants by the entireties, in the amount of $8,334.25, in The Denver National Bank of Denver, Pennsylvania. On November 6, 1948, after the death of her husband, Ella May Wann, accompanied by her daughter, Flor-

ence K. Boyer, went to The Denver National Bank of Denver, Pennsylvania, withdrew the sum of $8,334.25 from the joint account in the names of Peter H. Wann and Ella May Wann and deposited the same amount in an account in the names of Ella May Wann and Florence K. Boyer, payable to either or the survivor. At the same time, in the presence of certain bank officials, the mother and daughter executed an agreement providing, inter alia, that the funds in said account belonged to both parties jointly and that in the event of the death of either, the funds in the account should pass to the survivor. Ella May Wann died on July 20, 1950, at the age of 77 years, unmarried and intestate. Her heirs at law were Hazel M. Hassler, Florence K. Boyer, Ruth Kercher and Veoma L. Snyder, daughters of the decedent, and four grandchildren, children of William K. Wann, a deceased son. At the death of the decedent there remained a credit balance of $2,834.16 in the joint account. On March 19, 1951 letters of administration were granted to Hazel M. Hassler, one of the decedent's daughters, and on May 12, 1951 the administratrix filed a petition for a citation to show cause why certain money and property in the possession of Florence K. Boyer should not be paid over to the administratrix. An answer to the petition was filed claiming, inter alia, that the balance in the joint account amounting to $2,834.16 became the property of the respondent, Florence K. Boyer, upon the death of Ella May Wann. Hearings on the petition and answer were closed on June 28, 1951. On December 19, 1951 the administratrix joined with two other daughters of the decedent in filing a petition requesting a further hearing in order that testimony of Ruth Kercher and Veoma L. Snyder, who had not theretofore testified, be received in evidence. An answer to this petition was filed and after argument thereon the court below, by

opinion and decree dated July 18, 1952, dismissed the petition for further hearing and dismissed the petition seeking recovery of certain assets alleged to be the decedent's in the custody of Florence K. Boyer. Exceptions to the opinion and decree of the court below were dismissed and the decree of July 18, 1952, with certain modifications, was confirmed absolutely by the court below on December 6, 1952. This appeal by the administratrix followed.

As to the assets alleged to be the property of the decedent in the custody of the appellee, we are concerned in this appeal only with the joint bank account with the right of survivorship created by the decedent and her daughter, the appellee, on November 6, 1948.

The appellant attacks the validity of the joint bank account with the right of survivorship, contending that the decedent did not have sufficient mental capacity on November 6, 1948 to create the joint account and that a confidential relationship existed between the decedent and the appellee.

The specific allegations of the appellant relating to the mental capacity of the decedent are that at the time of her death in July, 1950 and for a long time prior thereto; at the time of her husband's death in November, 1948; and at the time the joint bank account was opened in the name of the decedent and her daughter, the decedent was "non compos mentis."[1] In

---

[1] *Black's Law Dictionary* defines "non compos mentis" as follows: "*Non Compos Mentis.* Lat. Not sound of mind; insane. This is a very general term, embracing all varieties of mental derangement. See Insanity. Coke has enumerated four different classes of persons who are deemed in law to be *non compos mentis*: *First,* an idiot, or fool natural; *second,* he who was of good and sound mind and memory, but by the act of God has lost it; *third,* a lunatic, *lunaticus qui gaudet lucidis intervallis,* who sometimes is of good sound mind and memory, and sometimes *non compos mentis; fourth,*

her petition for citation the appellant further averred: "8. That the name of Florence K. Boyer was added to the bank account for the convenience of the said decedent, who, at the time of the withdrawal of the moneys from the bank account which was in her name and her husband's name, was unable to care for her own property and was so weak in mind so as to become the victim of designing persons, and was in fact non compos mentis."

In support of the allegations appellant relies on the testimony of decedent's attending physician, Dr. L. H. Feick, who testified that on February 13 or 14, 1948 he had certified to an application to have Ella May Wann committed to Wernersville State Hospital; that on that date his opinion was "that she was mentally ill and it was best to get treatment at an institution." Dr. Feick also testified that he based his opinion "on the symptoms and general diagnosis." He stated "she was very nervous and emotionally unstable at times, memory poor, and then at times she was excitable—things like that." As to decedent's physical condition in February, 1948, the doctor testified— "Physically she was all right. Of course, her trouble was arterio sclerosis, and that is what produces those symptoms." There was also, as stated by the court below, ". . . testimony of numerous witnesses, in interest and without interest, to the effect that on various occasions, and without relationship to the acts now under consideration, the decedent showed signs of advancing years, slowing up of mental processes and indifference to the ordinarily important affairs of life."

However, advancing years and the slowing up of mental and physical processes do not establish a lack

one who is *non compos mentis* by his own act, as a drunkard. Co. Litt. 247a; 4 Coke, 124."

of legal capacity to execute a written instrument disposing of property. *Jones v. Schaefer,* 357 Pa. 628, 55 A. 2d 387. As stated by Justice (later Chief Justice) KEPHART in *Null's Estate,* 302 Pa. 64, 66, 153 A. 137: "The presumption as to gifts, inter vivos, is that the donor has mental capacity. This presumption can be rebutted. Capacity relates to soundness of mind, or in other words a mind that has full and intelligent knowledge of an act engaged in, an intelligent perception and understanding of the dispositions made of property, and the persons and objects one desires shall be the recipients of one's bounty: Lawrence's Est., 286 Pa. 58, 65. Old age, sickness, distress or debility of body do not prove or raise a presumption of incapacity (Wilson v. Mitchell, 101 Pa. 495), nor do inability to transact business, physical weakness, peculiar beliefs and opinions, or failure of memory: Lawrence's Est., supra, and authorities there cited. Want of mental capacity affects all transactions, and while, generally speaking, it requires more business judgment to make a gift than to make a will, as the former is immediately active while the latter is prospective, still incapacity as a fact must appear before the gift can be set aside."

In the instant case, though the decedent's attending physician signed papers for her admission, the decedent was never committed to the Wernersville State Hospital. Moreover, Dr. Feick, on cross-examination, testified that at times decedent was rational during the period shortly before February, 1948. Also, he testified she improved after February, 1948. *However, most important is Dr. Feick's testimony that Ella May Wann was mentally competent on November 5, 1948, the day before the joint account was opened by the decedent and her daughter.* In addition to the medical evidence of the mental capacity of the decedent on the day before the joint account was opened, the clear and

positive testimony of the cashier and assistant cashier of the bank fully establish that the decedent, on November 6, 1948, was in possession of all her mental faculties.

Amos Heisey, cashier of The Denver National Bank of Denver, Pennsylvania, who had known the decedent for between twenty and twenty-five years and who had frequent contacts with her in connection with deposits and withdrawals from bank accounts, testified that on the occasion of the creation of the joint account in the names of the decedent and Florence K. Boyer, ". . . Mrs. Wann asked us to place the money that was in her and her husband's name in the name of Ella May Wann or Florence K. Boyer, and we told her that she would have to sign a card, which we require in all joint accounts, and told her that either one is allowed to draw against the joint account. We always do that in our joint accounts." He testified: "Q. Did you go any further? A. She seemed to understand." He further testified: "Q. Will you tell us in what manner Mrs. Wann conducted herself on the occasions on which you saw her? A. All right, in all respects. Q. What do you mean 'in all respects'? A. Well, like any normal person would act—spoke intelligently, she was a cheerful woman when I saw her, I would say on the cheerful side. Q. Were there any exceptions to your last statement that she at all times acted normally? Were there any times she didn't act normally? A. Not that I saw her, never. . . . Q. Mr. Heisey, in your judgment, on November 6, 1948, did Ella May Wann understand the nature and the effect of the transfer of the joint bank account standing in the names of Ella May Wann or Peter Wann to the names of Ella May Wann or Florence K. Boyer? . . . The witness: I would say that again: yes, decidedly so. Q. Further, Mr. Heisey, in your judgment did Ella May Wann, on November 6,

1948, understand the amount of money which was involved in this transfer? A. Yes." Mignetta E. Burkholder, the assistant cashier of The Denver National Bank who had known the decedent about twenty years testified that she saw and talked to the decedent on November 6, 1948 on the occasion of the change in the account and saw her again on January 26, 1949 when Mrs. Wann came to the bank and signed a check and drew some cash. She testified: "Q. During those times that you did see Mrs. Wann, how did she act? A. She really was very cheerful. Q. How did she talk? A. Perfectly all right." She testified also as follows: "Q. Miss Burkholder, in your judgment, on November 6, 1948, did Ella May Wann understand the nature, the consequences, and the effect of the transfer of the funds standing in the joint account in the names of Peter Wann or Ella May Wann, to the account in the names of Ella May Wann or Florence K. Boyer? A. I would say she did. Q. In your opinion did she know who the parties were with whom she was dealing? A. Yes." Lengthy testimony of other persons who had come in contact with Ella May Wann on numerous occasions during the period from July, 1948 until after November, 1948, was also introduced. These witnesses stated that in social matters and business transactions the decedent conducted herself in a normal fashion. Where, as here, the testimony of her attending physician clearly establishes the decedent was mentally competent the day before the creation of the joint account in question, that the decedent herself requested the transfer from the joint account she had held with her deceased husband to a joint account with her daughter, where the procedure and effect of the transfer was explained to her by two bank officials who had known her for over twenty years, and where these same officials by clear, positive and direct testimony, state that

in their considered judgment the decedent fully under-
stood the transaction, knew the amount of money in-
volved, and the persons with whom she was dealing,
there is no basis to set aside the transaction on the
ground the decedent did not have sufficient mental
capacity at the time she entered into the agreement
establishing a joint bank account with right of sur-
vivorship with her daughter.

Nor is there any merit to the contention of the ap-
pellant that a confidential relationship existed between
the decedent and her daughter, the appellee. The joint
account in question was established at the request of
the decedent with funds wholly belonging to her on
November 6, 1948 at which time the decedent and the
appellee executed an agreement providing, inter alia,
that the funds belonged to both parties jointly and that
in the event of the death of either the funds in the
account should pass to the survivor. The decedent, by
the agreement, made an immediate gift to her daugh-
ter. *Fell Estate*, 369 Pa. 597, 87 A. 2d 310; *Fuller v.
Fuller*, 372 Pa. 239, 93 A. 2d 462. See *Chadrow, Exr.,
v. Kellman*, 378 Pa. 237, 106 A. 2d 594. However, as
stated in *Monongahela Trust Co. v. Kazimer*, 161 Pa.
Superior Ct. 380, 382, 54 A. 2d 841: "A gift by a par-
ent to a child is not an unnatural transaction, nor is
it an unusual one, and no presumption arises against
its validity. Ries' Estate, 322 Pa. 211, 185 A. 288; Rey-
nolds v. Maust, 142 Pa. Superior Ct. 109, 15 A. 2d 853.
In this case there was nothing unusual or unnatural
about the conveyance of her former home by mother
to her daughter, especially in view of the fact that the
mother was making her home and intended to make
her home permanently with the daughter." As between
parent and child the existence of a confidential rela-
tion is a question of fact to be determined from the
evidence, *Fuller v. Fuller*, supra; and the burden of

proving a confidential relationship is on the one who
asserts it. *Kees, Executor, v. Green,* 365 Pa. 368, 75
A. 2d 602. See *Gerner et al. v. Kespelher,* 351 Pa. 649,
41 A. 2d 860. This burden was not met. The mere fact
of consanguinity does not establish a confidential re-
lationship. *Monongahela Trust Co. v. Kazimer,* supra.
Pertinent here is the statement in *Null's Estate,* supra:
". . . the evidence to sustain such relation must be cer-
tain; it cannot arise from suspicion or from infrequent
or unrelated acts; care must be used not to confound
acts springing from natural love and affection with
confidential relations. . . ." In the instant case the
record shows the decedent was active in the negotia-
tions connected with the sale of the residence and per-
sonal effects of decedent and her husband in the sum-
mer and fall of 1948. Decedent was present and actu-
ally requested the transfer of the funds to the joint
account in question, she was alert and cheerful at the
bank not only at the time of the transfer but also in
her later visits to the bank. The record is barren of
any evidence of appellee transacting business of the
decedent except for signing checks on the joint account
in payment of decedent's bills. To establish a confiden-
tial relation between parent and child it should ap-
pear that a confidence or trust was reposed in the
child, occupying a position of supervision, authority
and general direction over the parent's business af-
fairs. *Null's Estate,* supra. Such a relationship was
not established in this case and the burden of proving
that the creation of the joint bank account was the
free and voluntary act of the decedent was not cast
upon the appellee.

The court below did not err in dismissing the peti-
tion for rehearing. As stated in the opinion of the
learned hearing judge: "The additional charges are
vague, uncertain and insufficient to require a reply

from the respondent. The facts and circumstances stated are not such as would be sufficient to support a suit in assumpsit covering the same subject matter. Furthermore, the petitioners were parties in interest, they were advised of the time and place of hearing. Their delay in seeking additional opportunity is unexplained." On the basis of such findings there is no ground for the allowance of a petition for rehearing.

Decree affirmed.