## Mulholland *v*. Pittsburgh National Bank, Appellant.

Argued October 5, 1964. Before Bell, C. J., Musmanno, Jones, Cohen, Eagen and Roberts, JJ.

*Frank E. Coho,* with him *Johnston & Coho,* for plaintiff.

*Donald C. Bush,* with him *Richard B. Tucker, Jr.,* and *Griggs, Moreland, Blair & Douglass,* and *Patterson, Crawford, Arensberg & Dunn,* for defendant.

*Walter A. Koegler,* guardian ad litem, in propria persona.

OPINION BY MR. JUSTICE JONES, March 16, 1965:

Laura E. Mulholland (appellee),[1] in 1940 married Richard Hoover. Of that marriage, dissolved by divorce in 1951, three children were born. Sometime prior to January 1953 she married Joseph Millar and of that marriage, dissolved by divorce in 1953, no children were born. Thereafter, she married Harold Mulholland and of that marriage one child has been born.

On many occasions in the period 1943-1950, by reason of appellee's excessive drinking, Richard Hoover, then appellee's husband, was compelled to hospitalize her in an attempt to cure her. On March 30, 1950, the Court of Common Pleas of Allegheny County declared appellee an "inebriate" and committed her to a Pennsylvania hospital where she remained until October 3, 1950, at which time the court provisionally released her. Thereafter, appellee went to Clearwater, Florida.

---

[1] Although Laura Mulholland is the appellant in Appeal No. 227 March Term, 1964, she is the appellee in Appeals Nos. 226, 241 March Term, 1964, and we shall refer to her throughout this opinion as the appellee.

While there she resumed her drinking to the extent that Richard Hoover removed the children, who had gone to Florida on a visit in January 1951 from her custody.[2]

On February 4, 1953, on petition of her father, appellee was adjudged by the Court of the County of Pinellas in Florida an "incompetent by reason of drunkenness, excessive use of drugs, chronic inebriacy, impulsive drinking, orgies, and occasional violence constituting anti-social pyschopathy". That court appointed appellee's father as guardian of appellee's person and he placed her in a Louisiana Sanitarium. In February 1954, upon application of her father, appellee was adjudged by the Court of Common Pleas of Allegheny County an inebriate, and appellee, having been returned to Pittsburgh, was committed to a Pennsylvania institution. Less than four months later, appellee was released by the court and placed in the custody of a Mrs. Lemmon.

On March 18, 1955, the Court of Common Pleas of Allegheny County found that appellee was "able to handle all her personal affairs", cancelled her probation and released her from custody. Since that time appellee has used neither alcohol nor drugs and has been in all respects a normal person.

On April 30, 1951, while in Florida, appellee executed two trust agreements and an assignment.[3] Under the first trust agreement, appellee transferred to the Pittsburgh National Bank, as trustee (Bank), certain securities and United States government bonds and, under the provisions of that trust, appellee is to

---

[2] In March 1951 Hoover instituted a divorce action against appellee in Allegheny County. A divorce was granted on August 1, 1951. In that proceeding, although appellee was represented by counsel, no question of appellee's disability was raised.

[3] The execution of these instruments is admitted and there is no evidence that at that time appellee was not sober.

receive the net income for life and so much of the principal as the Bank, in its sole discretion, may deem necessary to maintain and support her and, upon appellee's death, separate trusts, to terminate under certain conditions, such as attainment of a certain age, etc., were set up for "each of the issue of the [appellee] living at the [appellee's] death per stirpes." Under the second trust agreement, appellee transferred to the Bank, in trust, 2055 shares of Washington Oil Company common stock and created therewith three separate trusts for appellee's three children born of her marriage to Richard Hoover; under this trust appellee reserved no interest in either the income or the corpus for herself. Both trusts are irrevocable in nature. Under the assignment, appellee transferred to the Bank her interest in certain oil and gas leaseholds in Elk County, Pennsylvania, to become part of the principal of the first trust.

On August 1, 1960, appellee instituted an equity action in the Court of Common Pleas of Allegheny County against the Bank to set aside both the trust agreements and the assignment upon the grounds that at the time of execution of these instruments she was incompetent and unduly influenced and coerced both by her father, Richard Eastall, and her then husband, Richard Hoover. In this action, appellee's four children, then all minors, were joined and a guardian ad litem appointed for them. The court sustained preliminary objections to appellee's complaint on the grounds (1) of laches and (2) that the complaint insufficiently averred fraud, duress, coercion or undue influence. On appeal to this Court we reversed the order of the court below: *Mulholland v. Pittsburgh National Bank,* 405 Pa. 268, 174 A. 2d 861.

The matter was then heard in the Court of Common Pleas of Allegheny County and that court, after hearing, ultimately concluded that (1) appellee was

not guilty of laches, (2) appellee was incompetent at the time she executed the two trust agreements and the assignment, (3) impliedly at least, appellee had been subjected to undue influence to induce her to sign these instruments, and (4) at least inferentially, the Bank was not entitled to any compensation for its services. The court set aside the trusts. We are convinced, from our examination of this record, that the court below erred in all four respects.

In passing upon the issues presented upon these appeals,[4] we must begin with reference to our determination of the prior appeal in this matter, a determination, apparently, subject to some misunderstanding on the part of appellee's counsel as well as of the court below.

The posture in which *Mulholland,* supra, was presented to us was a challenge to the propriety of the action of the Court of Common Pleas of Allegheny County in sustaining preliminary objections to and in dismissing appellee's complaint. On that appeal, we were required to accept *as true* all well-pleaded facts in appellee's complaint (*Necho Coal Co. v. Denise Coal Co.,* 387 Pa. 567, 568, 128 A. 2d 771) and to sustain that complaint, if from an examination of the complaint, it was *not* clear that appellee had been guilty of laches or had not set forth a good cause of action. Viewed in the light of such requirements, the decisional point of *Mulholland,* supra, was that it *appeared* from the facts pleaded in the complaint that laches could not be imputed to appellee because she *might*

---

[4] One appeal is by the Bank (No. 241 March Term, 1964), one appeal by the guardian ad litem for the remaindermen under the trusts (No. 226 March Term, 1964) and one appeal by appellee (No. 227 March Term, 1964). Appellee's appeal is from an order, made subsequent to the decree in the equity action, allowing counsel fees and costs to the guardian ad litem, while the other appeals are from the court's decree.

*have been* under a legal disability at the time and that, even though it was not clear from the complaint that fraud, duress, coercion or undue influence had been exerted upon appellee, the complaint was not so defective as to justify its *summary* dismissal. Critical in our determination of that appeal were the averments in the complaint that on February 4, 1953 and on June 24, 1960, a Florida court had found that appellee had been incompetent since March 30, 1950—thirteen months prior to the execution of the trust agreements and assignment—and our doubt, arising from the pleadings, of the impact on the question of laches of the decree of the Pennsylvania court which found appellee competent on March 18, 1955—over five years prior to the institution of the equity action.

We, therefore, concluded in *Mulholland,* supra, that, *upon the face of appellee's complaint,* a *summary* dismissal of the complaint should not have been directed and we directed that appellee should have "her day in court". Upon that basis, the matter was returned for disposition to the court below.

On these appeals four principal issues are presented: (1) was appellee guilty of laches? (2) was appellee mentally competent on April 30, 1951, the date upon which the trust agreements and assignment were executed? (3) was appellee unduly influenced and coerced in the execution of these instruments? (4) whether the Bank is entitled to any compensation for its services as trustee?

The adjudication of the court below indicates an understanding on the part of the court that by our decision in *Mulholland,* supra, we had foreclosed any further consideration of the question of laches. That is just not so. In *Mulholland,* supra, from the pleadings it appeared that, if the Florida court had jurisdiction over appellee on February 4, 1953, when it declared her incompetent, then that order read in con-

nection with the order of the Florida court of June 24, 1960, could be construed to mean that, until five weeks prior to the institution of this equity action, appellee was legally incompetent and the circumstances were such that laches could not be imputed to her. Moreover, in view of the paucity of the facts before us, we could not determine the impact on laches of the finding of appellee's competence by the Pennsylvania court on March 18, 1955. The voluminous record now before us presents an entirely different situation than *Mulholland,* supra, presented.

The record shows that, in February 1953, the Florida court appointed a committee, composed of two psychiatrists and a layman, to inquire into appellee's alleged incompetency and such committee filed a report stating, inter alia: "We determine that [appellee] is not incompetent except by reason of chronic inebriacy".[5] On the basis of that report, as well as the court's personal examination of appellee, the court found that appellee was incompetent, "by reason of drunkenness, excessive use of drugs, chronic inebriacy, impulsive drinking, orgies and occasional violence constituting anti-social psychopathy" and appointed appellee's father as guardian of her person.

Judge PHILLIPS, who as a then practicing attorney in Florida had been counsel for appellee's father in the 1953 proceeding and later appellee's counsel in the 1960 proceedings, testifying, by way of deposition, stated that the order of February 4, 1953, was not retroactive and did not constitute a declaration or finding by the court that appellee was an incompetent prior to that date.

---

[5] This report consisted of a printed form with the blanks filled in. Paragraph 1, which read "We determine that . . . he is incompetent, the apparent cause being . . .," was lined out and the statement, supra, inserted.

Judge WHITE, the judge who made the order of February 4, 1953, on February 9, 1954, wrote to the Director of the Bureau of Mental Health in Pennsylvania, stating (1) that Florida law conferred jurisdiction over persons temporarily sojourning in that state or otherwise found within the state "without requiring residence", (2) that the court was not aware of any residence of appellee in Florida and that the court considered her residence to be in Pittsburgh and (3) that he considered it desirable that she be transferred to "her home jurisdiction in Pennsylvania for such care, treatment or *other disposition* as the Pennsylvania Courts may consider meet and proper." (Emphasis supplied).

The record further reveals, that, in June 1960 Judge PHILLIPS was employed as appellee's counsel because appellee desired "to clean up the record to restore her to her competency legally"[6] and Judge PHILLIPS stated that the order of June 24, 1960, did not constitute a finding that appellee was competent or incompetent on any date prior to February 4, 1953. Under the testimony of Judge PHILLIPS, personally knowledgeable of both the 1953 and 1960 proceedings as well as of the applicable law of Florida, neither the order of February 4, 1953, nor the order of June 24, 1960, established appellee's incompetency on any date prior to February 4, 1953. On March 18, 1955, the Court of Common Pleas of Allegheny County, appellee's county of residence and domicil, found that appellee was at that time "able to handle her own personal affairs" and it is undisputed that since at least March 18, 1955, appellee has acted as a normal person. Both such facts were found by the court below.

*Prior to 1955,* appellee's condition was due to excessive drinking on the rebound from which she would

---

[6] Judge PHILLIPS was not informed that the record was to be used elsewhere for any purpose.

excessively use drugs and her behavior, following such excessive use of alcohol, required that she be frequently hospitalized. When the Florida court, on February 4, 1953, found that the appellee was incompetent such incompetency was expressly restricted to her conduct caused by excessive drinking. A study of the report of the commission appointed by the Florida court reveals clearly such limitation of its opinion as to her incompetency. There is no suggestion whatsoever that appellee was mentally deranged, a lunatic or mentally defective; on the contrary, whatever behavior she exhibited was due to the excessive use of alcohol.[7]

. Three separate periods of time are portrayed on this record: (a) 1943-April 30, 1951, the date of execution of the three instruments; (b) April 30, 1951 to March 18, 1955, the date when the Pennsylvania court found appellee competent; (c) March 18, 1955 to August 1, 1960, the date when this action was instituted. During the first period, appellee, addicted to the excessive use of alcohol, was hospitalized at least on five occasions; a Pennsylvania court found her to be an "inebriate" and committed her as such but six months later released her; thereafter, she continued to drink excessively. During the second period, appellee continued her drinking but was not adjudged by the Florida court incompetent by reason of inebriacy until ten months after the challenged instruments were executed; she was hospitalized in three different institutions; adjudged in Pennsylvania an "inebriate"; finally, at the end of the period, appellee was found capable of handling her own affairs, a finding which implicitly recognized good behavior for some time prior to March

---

[7] It is of interest to note that The Pennsylvania Mental Health Act of 1951 (Act of June 12, 1951, P. L. 533, §§101-1002, 50 P.S. §§1071-1622) expressly excludes "inebriety" from the term "mental illness" and makes the same distinction as to competency shown by this record.

18, 1955.[8]  During the third period—a period of almost five and one-half years—appellee's behavior was that of a normal person.

Recently in *Brodt v. Brown*, 404 Pa. 391, 393, 394, 172 A. 2d 152, Mr. Justice EAGEN, speaking for this Court, said: "Laches has been defined as neglect for an unreasonable and unexplained time under circumstances permitting diligence to do what in law should have been done. [citing authority]. However, the operation of the doctrine does not depend solely upon the passing of time: [citing authority]. Laches will not be imputed where no injury has resulted to the other party by reason of the delay: [citing authority]. In the absence of prejudice to the one asserting laches, the doctrine will not be applied: [citing authority]."[9]

In the case at bar, nine years elapsed from the time appellee executed the trust agreements until she instituted this action.  The evidence clearly shows that appellee had full knowledge of the creation of both trusts and, in fact, the documentary evidence shows not only her knowledge of the existence of the trusts but that she was the income beneficiary of only the first trust.  Assuming, arguendo, that, during the second period up until March 18, 1955, appellee was drinking to excess and should be excused from asserting her right, if any she had, to set aside these trusts—an assumption belied by this record—there is not the slightest doubt that during the third period she was

---

[8] During this period, appellee was divorced twice and married twice; for divers purposes she retained various lawyers; she indulged in correspondence concerning various problems involved in the trusts; she received regularly and accepted income from the first trust, with full knowledge of the source of the payments; she executed powers of attorney and other documents necessary in the administration of the trusts.

[9] Laches is "not mere delay, but delay that works a disadvantage to another": 2 Pomeroy's Equity Jurisprudence (5th ed.), §419d, p. 179.

a perfectly normal person, as found by the court below, and, yet, for a period of almost five and one-half years she never questioned the validity of the trusts or sought to have them set aside. No valid excuse, except her alleged legal disability, for such inaction and lack of diligence appears on this record.

During this long period of delay, appellee's father died. Accepting, arguendo, as credible the testimony of appellee's witnesses and appellee in this respect, appellee's father "engineered" the creation of these trusts and the complaint charges him as one of two parties who unduly influenced the appellee to execute the trust instruments. Appellee's father was a most important, if not the key, witness from the point of view of those seeking to uphold the trusts and the unavailability of his testimony has seriously prejudiced both the guardian ad litem and the Bank.

We agree further with the statement in the Bank's brief (at p. 45) : "[Appellee's father] died in May of 1955 feeling that his grandchildren would benefit from these trusts. The main asset of one of the trusts was Washington Oil stock that had been his and which he had retained since appellee's marriage in 1940. . . . At this time appellee was not only the beneficiary of a trust set up by her father in 1927 but also beneficiary under a trust of her mother. It is certainly reasonable to assume that [appellee's father], if aware that appellee would after his death seek to have the trust funds of the minor children set aside for her personal benefit, would not have placed the stock into a trust for appellee but would have made other provision for same to go to his grandchildren. This is the corpus of the trust that goes to the three children. . . . The Chancellor stated: '. . . the Hoover children are and will be no worse off than they were prior to [appellee's] execution of these instruments . . . .' This is not

based on fact. The action of appellee cuts off the minor beneficiaries from funds which they, their grandfather and others expected them to receive. These individuals on the basis of that knowledge made their distributions as deemed appropriate under the circumstances. The position of the minor grandchildren was strongly prejudiced in the eyes of their possible benefactors. In each instance the appellee was the beneficiary. The minor children were not."

In this record there is correspondence consisting of some 21 letters, from the Bank to appellee and the appellee to the Bank, during the period from June 1951 to November 1952. This correspondence shows unequivocally that, eight to nine years before the institution of this action, appellee was fully cognizant of the trusts and even of the manner in which some investments of trust funds were being made. Regularly, appellee accepted payments from the Bank knowing that the source of such payments was the so-called first trust. For nine years, despite knowledge on her part, appellee never questioned the validity of the trusts; more important, however, during the period between March 1955 and August 1960, when appellee concededly was acting as a normal person, rational in her actions and free from the influence of alcohol and drugs, she made no effort to challenge these trusts. Even now appellee does not maintain that she did not know of the trusts, their purpose or that any material facts concerning them were withheld or concealed from her.

In an attempt to excuse her delay, inaction and lack of diligence, appellee seeks to rely on a fiction. She argues that, by reason of the Florida decree of February 4, 1953, she remained under a legal disability which precluded the imputation of laches to her until by the stroke of a pen such legal disability was ex-

tinguished by the Florida decree of June 24, 1960.[10] Such contention is made despite the fact that after March 18, 1955, she was completely normal—so found by the court below and not disputed on this record—and had been held by a Pennsylvania court on March 18, 1955, capable of handling her own affairs. Particularly in a court of equity, resort should not be had to a fiction to establish a status which had not existed in fact for almost five and one-half years.

We are fully cognizant of the full faith and credit to be given to a decree of a court of another jurisdiction, assuming that such court had jurisdiction over the person when such decree was made.[11] However, under the instant circumstances, we do not consider the Florida decree of June 24, 1960, binding upon us to the extent that we must find appellee under a legal disability up until that time. The Florida decree of February 4, 1953, found appellee incompetent by reason of inebriacy, a condition well recognized as subject to change and, in many instances, impermanent in nature. One year after such finding the Florida court relinquished whatever jurisdiction it had over appellee to Pennsylvania "for such care, treatment or *other disposition* as the Pennsylvania Courts may consider meet and proper." (Emphasis supplied). The scope and breadth of such relinquishment by the Florida court, in whose jurisdiction appellee was a temporary

---

[10] If this argument of appellee is sound, she could have delayed ad infinitum without risk of the imputation of laches.

[11] There is a diversity of views as to the extraterritorial effect of an adjudication of competency or incompetency. One view holds such adjudication is conclusive and commands full recognition. A second view grants such adjudication presumptive recognition, i.e., until or unless it be shown that the status does not exist or has been changed. A third view holds such adjudication is not binding and requires an independent finding or adjudication. See: 102 A.L.R. 444 and cases therein cited.

sojourner, to the Pennsylvania courts, in whose jurisdiction appellee had her permanent residence and domicile, left no doubt that the Pennsylvania courts could act with impunity in determining the future competence of appellee without infringing upon the Florida decree of February 4, 1953.[12] In view of such relinquishment of jurisdiction, formal restoration of competency by the Florida court became unnecessary; the Pennsylvania courts were given full authority to determine the future competence of appellee.[13] When the Pennsylvania court found on March 18, 1955, that appellee was then competent, such action did not constitute judicial interference with the legal processes of the Florida court.

The question of laches is factual and to be determined upon an examination of all the circumstances: *Lehner v. Montgomery*, 180 Pa. Superior Ct. 493, 502, 119 A. 2d 626. The incompetence of appellee found by the Florida court was restrictive and limited in nature,[14] the Florida court relinquished its jurisdiction to Pennsylvania to determine appellee's future competence, a Pennsylvania court did thereafter find that appellee was competent and, thereafter, appellee,

---

[12] Under these circumstances, *Lusson Petition*, 18 Pa. D. & C. 2d 794, is inapposite. Cf. *McNeill v. Harlow*, 81 Fla. 401, 88 So. 127.

[13] In *Mulholland*, supra, we said (p. 273): "Even though the Pennsylvania court had jurisdiction over [appellee's] person in 1954, its finding of competency in 1955 could not affect the fact that [appellee] was still under a disability in Florida: [citing authorities]." The circumstances *now* revealed by this record render inapplicable both that statement in *Mulholland* and the authorities cited in support thereof.

[14] It may be noted that the disability claimed by appellee would not have tolled the statute of limitations: Act of March 27, 1713, 1 Sm. L. 76, §5, 12 P.S. §35; Act of April 22, 1856, P. L. 532, §1, 12 P.S. §82. See also on this subject generally: *Wright v. Fisher*, 65 Mich. 275, 32 N.W. 605, 609, 610.

admittedly for almost five and one-half years, did manage her own affairs and acted in a normal and responsible manner. Such facts clearly negative any requirement that there be a formal decree by the Florida court of restoration of appellee's competence before appellee could be considered free of a legal disability and a person to whom laches could be imputed.[15]

In our view, appellee, neither factually nor legally, after March 18, 1955, was under a legal disability and the decree of the Florida court of June 24, 1960, simply confirming that which was appellee's status, in law and fact, in Pennsylvania, is of no legal import. After March 18, 1955, appellee was under no legal disability such as would immunize her from the application of the doctrine of laches.

The delay in the institution of this action is clearly inexcusable and such delay persisted in for over five and one-half years has seriously prejudiced the rights of those who defend these trusts. Under such circumstances, appellee is barred of recovery on the ground of laches.

In view of the conclusion we have reached, it is unnecessary to consider the other questions raised on these appeals. However, it may not be amiss to note that a careful study of this record indicates that appellee was competent when she executed the trust agreements and the assignment,[16] that neither appel-

---

[15] The reasons for appellee's resort to the Florida court in 1960 are obvious: (a) an attempt to avoid the application of laches and (b) an effort to establish retroactively appellee's incompetence to a date prior to the time the trust instruments were executed.

[16] In reaching this conclusion, we have drawn our own inferences and conclusions from the evidence and have set aside deductions and inferences made by the court below which are not supported by the evidence: *Girsh Trust*, 410 Pa. 455, 467, 189 A. 2d 852. It should also be noted that respect for the integrity of written instruments requires that such should not be set aside unless there is convincing evidence that the person who executed them

lee's father nor her then husband exerted any undue influence, fraud, or coercion upon her and that both the Bank and the guardian ad litem are entitled to compensation for their services.

Decree reversed and order affirmed. Costs on appellee.

---

lacked the mental capacity at the time to do so or was subjected to fraud or undue influence: *Jones v. Schaefer*, 357 Pa. 628, 637, 55 A. 2d 387; *Jenne v. Kennedy*, 379 Pa. 555, 560, 561, 109 A. 2d 307. In the case at bar the evidence falls far short of conviction.