Leila HILKMANN, Appellee,

v.

Dirk H. HILKMANN, Appellant.

**In re Estate of Daniel Hilkmann, an alleged incompetent adult.**

Superior Court of Pennsylvania.

Argued Oct. 2, 2002.

Filed Jan. 21, 2003.

Stephen L. Christin, Pittsburgh, for appellant.

Todd Begg, Pittsburgh, for appellee.

Before JOYCE, MUSMANNO, and CAVANAUGH, JJ.

OPINION BY CAVANAUGH, J.:

¶ 1 Appellant Dirk H. Hilkmann ("Father"), appeals from the order entered on March 25, 2002, appointing Leila Hilkmann ("Mother") guardian over their son, Daniel Hilkmann, a dual citizen of the United States and Israel, on the basis of his alleged incompetency. We reverse.

¶ 2 The facts are generally undisputed. The parties, prior to their July 6, 1994 divorce in Texas, had two children: Daniel, born August 31, 1981, who has a learning disability, and Natalie, a daughter, born June 22, 1984, who resides in Israel with Mother. Daniel presently lives with Father, who resides in this state. Pursuant to their divorce decree, Mother was assigned primary physical and legal custody of their two children.

¶ 3 Mother then moved to Israel with the children and enrolled Daniel in a "special education school for learning disabled students" in 1995. After a child turns eighteen years of age, the school requires a guardian to sign the relevant paperwork before allowing the child to continue his or her education. Thus, on July 6, 1999, the school essentially requested that Mother become a guardian over Daniel so he could

continue to attend the school past his eighteenth birthday.[1]

¶ 4 On July 14, 1999, Mother filed a guardianship petition with the Israeli family court. Apparently attached to the petition was a medical opinion by Daniel's pediatrician purportedly attesting to Daniel's mental incapacity. On October 27, 1999, based upon the Israeli Attorney General's recommendation, the Israeli family court temporarily appointed Mother guardian for six months. Additionally, Mother, responding to Israeli family court directives, submitted an additional medical report by Daniel's Israeli pediatrician. The pediatrician asserted, based upon his impression and "additional medical opinions" provided by Mother, that Daniel is incapable of expressing an opinion on Mother's petition. We remain unaware of whether Daniel's Israeli pediatrician relied upon a March 7, 1994 medical opinion by Daniel's American pediatric neurologist that is included in the record. The certified record, however, does not contain any other "additional medical opinions." Mother also forwarded a translated copy of the petition to Father for his response.

¶ 5 Father received the petition in early December of 1999 and chose not to immediately respond. It was during the children's previously-scheduled visit in late December of 1999, that Father first informed Daniel of Mother's Israeli guardianship petition. Mother recounted that when the children returned to Israel, Daniel was upset with her and she had to take him to her attorney and a psychologist to calm him down. Mother explained, "[w]hen I initiated this [petition], I did not—I was not able to share it with Daniel. Obviously, had I been able to share it, I would not have needed the document." N.T., Mar. 19, 2001, at 54.

¶ 6 The Israeli Attorney General, after noting Father's failure to respond, recommended that Mother be appointed Daniel's permanent legal guardian and the Israeli family court agreed. The Israeli family court apparently granted Mother permanent legal guardianship over Daniel on January 31, 2000, thereby ending the temporary guardianship ahead of schedule.

¶ 7 Father finally responded on February 8, 2000, protesting the Israeli court's grant of permanent guardianship. On April 10, 2000, the Israeli Attorney General forwarded Father's response to the Israeli family court and recommended a hearing with both parties and Daniel present. Father purportedly asserted that Mother would use the guardianship to limit or prevent Daniel's visits to see Father. Furthermore, according to Father, Daniel had expressed a wish to move to the United States upon completion of his Israeli education.

¶ 8 In July 2000, the parties' children flew to the United States to see Father for a previously scheduled visit. While the daughter timely returned to Israel on July 31, 2000, Daniel stayed with Father. The parties dispute whether Daniel independently chose to remain with Father.

¶ 9 On August 8, 2000, the Israeli Family Court, abiding by the Israeli Attorney General's April 10, 2000 recommendation and overlooking its January 31, 2000 disposition, scheduled a hearing. On August 10, 2000, however, the family court "cancelled" the August 8, 2000 decision, reasoning that Mother was awarded permanent "custody" in January 2000. The family court thereafter requested a "welfare report" to clari-

---

**1.** Mother mistakenly transposed the date of the school's request. *Compare* R.R. 72a, *with* 74a.

fy "[Daniel's] stand [sic] regarding his mother's custody and detail the relationship between [Daniel] and his mother." R.R. at 10a.

¶ 10 Also in August of 2000, Father enrolled Daniel in a local community college program for persons with special needs. On September 5, 2000, Mother registered the Israeli guardianship order, which was mistakenly translated as a "custody" order, in a Pennsylvania court. On October 3, 2000, Mother filed a petition requesting that Pennsylvania enforce the Israeli guardianship order by forcing Daniel to return to Mother in Israel. Mother, in so filing, sued Father to enforce a guardianship order against Daniel, an adult.

¶ 11 On October 5, 2000, the lower court scheduled a hearing on March 19, 2001, at which time only Mother testified. Father, Daniel and other family members were not given the opportunity to testify. Another hearing, for the purposes of legal argument only, was held on August 20, 2001 and the trial court, on December 18, 2001, granted Mother's petition and, as relief, appointed Mother guardian of Daniel.

¶ 12 Father filed exceptions and on March 25, 2002, the lower court, *en banc*, affirmed the decision below. We stayed the granted relief. Father now appeals and presents the following issues for our consideration, reproduced *verbatim:*

I.  Whether the lower court satisfied due process rights by enforcing a foreign guardianship order without making an independent evaluation of the subject of the order, without making the subject of the order a party, without allowing the defendant or the subject of the order to testify or submit any evidence of any kind and without ruling on a timely motion in *limine* although the moving party was permitted to testify and offer evidence when it is undisputed that the subject of the guardianship order received no notice of the foreign proceedings?

II. Whether jurisdiction exists and/or whether the principle of comity can support the enforcement of a foreign guardianship order over an adult and United States citizen without statutory or other authority when the full faith and credit clause of the United States Constitution is inapplicable?

¶ 13 We address the jurisdictional issue first. The lower court, in employing comity, reasoned in its opinion *sur* appeal:

> [the] principle of comity applied to the matter because the Israeli Guardianship Order was not tainted by fraud or prejudice, nor did it outrage this Court's sense of justice. Additionally, the Israeli Guardianship Order was not obtained for the purpose of contravening our laws or public policy.

Trial Op. *sur* appeal at 2.

¶ 14 Father argues that we lack jurisdiction as Mother never filed a guardianship petition. Father also asserts that, given Mother's failure to cite to any international agreements or treaties providing for "full faith and credit" treatment to an Israeli order, this court lacked the jurisdiction to enforce the Israeli guardianship order. Father's second argument relies upon the common law principle that a finding of competency is a finding that is limited to the local jurisdiction. Thus, Father asserts, this state should not recognize findings of incompetency by our sister states and, by extension, foreign countries.

¶ 15 Mother counters that the principle of comity applies. Mother submits we should recognize extra-national guardianship decrees given our recognition of, *inter*

*alia,* foreign money judgments,[2] sentences imposed by other sovereigns[3] and foreign adoptions.[4] Thus, we inquire whether we may exercise jurisdiction to recognize an Israeli guardianship order.

¶ 16 Briefly, the standard of review is whether the lower court abused its discretion in applying comity. *See Philadelphia Gear Corp. v. Philadelphia Gear de Mexico, S.A.,* 44 F.3d 187, 191 (3d Cir.1994) (citation omitted). In recognizing extra-national foreign judgments, we have relied upon the Restatement 2d, Conflicts of Laws, § 98, which states:

> A valid judgment rendered in a foreign nation after a fair trial in a contested proceeding will be recognized in the United States so far as the immediate parties and the underlying cause of action are concerned.

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 98; *accord Drakulich v. Drakulich,* 333 Pa.Super. 273, 482 A.2d 563 (1984). Our courts, however, may choose not to enforce an extra-national judgment if it violates our public policy. *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 117; *cf. Everson v. Everson,* 494 Pa. 348, 431 A.2d 889 (1981) (enforcing Arizona judgment even though judgment contravened Pennsylvania law or public policy).

¶ 17 In *Drakulich,* we addressed whether a Yugoslavian support order was binding in this state. We concluded that recognition was warranted under the following rationale:

> Although we must give full faith and credit under the mandate of the United States Constitution to a decree of adoption by a court of a sister state if such court had jurisdiction over the parties and the subject matter, judi-

cial decrees rendered in foreign countries depend for recognition in Pennsylvania upon comity...

*In re Christoff's Estate,* 411 Pa. 419 at 422, 192 A.2d 737 at 738 (1963).

Applying Pennsylvania law, the Third Circuit explained the concept of comity.

> Comity is a recognition which one nation extends within its own territory to the legislative, executive, or judicial acts of another. It is not a rule of law, but one of practice, convenience, and expediency. Although more than mere courtesy and accommodation, comity does not achieve the force of an imperative or obligation. Rather, it is a nation's expression of understanding which demonstrates due regard both to international duty and convenience and to the rights of persons protected by its own laws. Comity should be withheld only when its acceptance would be contrary or prejudicial to the interest of the nation called upon to give it effect.

*Somportex Ltd. v. Philadelphia Chewing Gum Corp.,* 453 F.2d 435 at 440 (1971), *cert. den.,* 405 U.S. 1017, 92 S.Ct. 1294, 31 L.Ed.2d 479 (1972).

*Drakulich v. Drakulich,* 333 Pa.Super. 273, 482 A.2d 563, 565 (1984) (alteration in original) (footnote omitted). The *Christoff* court elaborated:

> [w]hen an action is brought in a court of this country, by a citizen of a foreign country against one of our own citizens...and the foreign judgment appears to have been rendered by a competent court, having jurisdiction of the cause and of the parties, and upon due allegations and proofs, and opportunity to defend against them, and its proceed-

---

**2.** *See* 42 Pa.C.S.A. § 4306.

**3.** *See* 42 Pa.C.S.A. § 9761(b).

**4.** *See* 23 Pa.C.S.A. § 2908.

ings are according to the course of a civilized jurisprudence, and are stated in a clear and formal record, the judgment is *prima facie* evidence, at least, of the truth of the matter adjudged; and it should be held conclusive upon the merits tried in the foreign court, unless some special ground is shown for impeaching the judgment, as by showing that it was affected by fraud or prejudice, or that, by the principles of international law, and by the comity of our own country, it should not be given credit and effect.

*Christoff, supra* at 423, 192 A.2d 737 (quoting *Hilton v. Guyot,* 159 U.S. 113, 16 S.Ct. 139, 40 L.Ed. 95 (1895)) (alteration in original). Thus,

> [t]his Commonwealth would "ordinarily grant recognition and credit to the decrees" of foreign tribunals "unless the decree is so palpably tainted by fraud or prejudice as to outrage our sense of justice, or where the process of the foreign tribunal was invoked to achieve a result contrary to our laws or public policy or to circumvent our laws or public policy." *In re Christoff's Estate, supra,* 411 Pa. at 424, 192 A.2d at 739.

*Drakulich, supra.* We must bear in mind that "it is the primary duty of the courts of this Commonwealth to ensure that justice is done." *Christoff, supra* at 739.

¶ 18 We note that in *Mulholland v. Pittsburgh Nat'l Bank,* 418 Pa. 96, 209 A.2d 857 (1965), our supreme court commented:

> [t]here is a diversity of views as to the extraterritorial effect of an adjudication of competency or incompetency. One view holds such adjudication is conclusive and commands full recognition. A second view grants such adjudication presumptive recognition, *i.e.,* until or unless it be shown that the status does not exist or has been changed. A third view

holds such adjudication is not binding and requires an independent finding or adjudication.

*Mulholland, supra* at 864 n. 11 (citation omitted). The *Mulholland* court, however, did not settle upon one particular viewpoint due to the jurisdictional posture of that case. Additionally, the guardianship order was improperly registered as a custody order under the Pennsylvania implementation of the UCCJA. The transformation of Mother's suit to enforce said custody order into a suit to recognize an international guardianship order led, at least in part, to the instant jurisdictional question.

¶ 19 We conclude that under comity, we have the jurisdiction to consider whether to enforce an extra-national guardianship order. Relying upon statutory authority and comity, we have recognized extra-national support orders, money judgments, divorce and adoption decrees. While the parties have not cited, nor have we located, any statutory authority or decisional case law directly addressing recognition of extra-national guardianship orders, we note that such decrees, as issued by other states, are not necessarily entitled to recognition. *Compare Mulholland v. Pittsburgh Nat'l Bank,* 418 Pa. 96, 209 A.2d 857 (1965) (finding in favor of a 1955 Pennsylvania decree adjudicating appellee competent and against a 1960 Florida decree finding appellee incompetent; an earlier 1953 Florida decree found appellee incompetent but later relinquished jurisdiction to Pennsylvania), *with McMullin v. Commonwealth Title Ins. & Trust Co.,* 261 Pa. 574, 104 A. 760, 762 (1918) (commenting "that the [lower] court was here under misapprehension as to its proper functions in this particular case; the lunatic here was not its ward; it had not adjudged him a lunatic, and could not have done so, had it attempted it, inasmuch as it had no

jurisdiction over him, he being resident of another state. He was the ward of a court in another state and that court alone had jurisdiction over his person.").[5]

 ¶ 20 With respect to recognizing and enforcing the instant guardianship order, we find that the lower court abused its discretion as we find the Israeli order, as enforced, violates both our public policy and our sense of justice. *See Christoff, supra.* Mother's original request for relief was that the court order Father to "immediately cause [Daniel] to be returned to his Mother's custody in Israel...." The lower court chose to appoint Mother guardian over Daniel in Pennsylvania.

¶ 21 The lower court's decision would establish a precedent whereby any foreign citizen could enforce any guardianship decree and commensurate finding of incompetency, regardless of the manner in which it was issued. In recognizing the Israeli decree, the lower court disregarded the fact that the Israeli court did not hear any neurological, psychological or any other testimony addressing Daniel's mental capacity. The Israeli tribunal solely relied upon the written opinion of Daniel's Israeli pediatrician in deciding that Daniel (a) lacked the mental capacity to handle his affairs and (b) lacked the mental capacity to express an opinion on Mother's guardianship petition. Furthermore, Daniel's interests were not represented at the Israeli proceeding. Six months passed before Daniel was even notified of the petition and he became quite upset when he learned of it.

¶ 22 We will not approve an order that, under the doctrine of comity, enforces an extra-national guardianship order over an adult American citizen when the only ex-

pert testimony to support the guardianship was from Daniel's Israeli pediatrician. No psychiatric, psychological, educational achievement, or learning capability evidence was proffered. No legal representation was provided to the potential ward.

¶ 23 To recognize and enforce the Israeli guardianship decree under these factual circumstances is repugnant to our sense of justice. Any future guardianship awarded by this Commonwealth should be in accordance with the protections granted by our statutes.

¶ 24 We reverse. Order vacated. Jurisdiction relinquished.

---

**5.** Our trial courts also have had the opportunity to examine this issue. *See e.g., Estate of Anthony Gillis,* 22 Pa. D. & C.3d 267 (Pa.

Com.Pl.1982); *Petition of Lusson,* 18 Pa. D. & C.2d 794 (Pa.Orph.1959).